# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

INNOVATIVE METAL CRAFT, LLC, )
)
)
Plaintiff, )       Case No. 1:17-cv-138
v. )
)
JON WHALEY and THE BARNDOOR )
HARDWARE STORE, LLC, )
)
Defendants. )

## MEMORANDUM OPINION

This civil action arises out of an employment/ business dispute between Plaintiff Innovative Metal Craft, LLC ("IMC") and its owner, Timothy Haskins ("Haskins"), on one hand, and Defendants Jon Whaley ("Whaley") and The Barndoor Hardware Store, LLC ("BDHS") on the other. IMC's complaint asserts claims against the Defendants under the Lanham Act as well as Pennsylvania law. Defendants have counterclaimed against IMC for libel.

Presently pending before the Court are the parties' respective motions for partial summary judgment. For the reasons that follow, Defendants' motion will be granted and Plaintiff's motion will be dismissed without prejudice.

1

## Factual Background[1]

IMC is a Pennsylvania Limited Liability Company owned by Haskins and primarily engaged in the business of manufacturing and selling spiral staircases.  DSMF ¶¶4, 8, 51.  At all times relevant to this litigation, IMC operated under the fictitious name "Spiral Stairs of America" and conducted its sales through the website www.spiralstairsofamerica.com.  DSMF ¶12.

In 2014, IMC was involved in a Florida lawsuit that resulted in an $89,000 judgment against it.  PARA ¶57.   The judgment was transferred to Pennsylvania and, along with a Pennsylvania sales tax lien, it threatened IMC's business as a going concern.  Id.

In or around August 2014, Whaley became employed by IMC as a salaried, exempt employee.  DSMF ¶5.  Whaley's primary responsibilities were to run IMC's office and assist with sales and marketing.  Id.  Whaley was not an owner, officer, director, or member of IMC.  Id. ¶6.

In early 2015, Whaley and Haskins discussed the possibility of Whaley purchasing IMC's assets.  PARA ¶58.  Although these discussions continued throughout 2015 and into early 2016, they did not result in Whaley actually purchasing IMC's business or assets.  Id.

In the Spring of 2015, Whaley suggested that IMC utilize scrap materials from its spiral staircase manufacturing process to manufacture "barn door hardware."  DSMF ¶8.  Around this

---

[1] The following facts are derived from:  Plaintiff's statement of material facts, ECF No. 86, and Defendants' responses thereto, ECF No. 97 (collectively, "PSMF"); Defendants' statement of material facts, ECF No. 90, and Plaintiff's response thereto, ECF No. 94 (collectively, "DSMF"); Defendants' additional responsive allegations, ECF No. 97 and Plaintiff's responses thereto, ECF No. 104 (collectively, "DARA");  and Plaintiff's additional responsive allegations, ECF No. 94, and Defendants' responses thereto, ECF No. 101 (collectively, "PARA").  Where relevant, the Court has also drawn from undisputed portions of the evidentiary record.  Unless otherwise indicated, the following facts are not contested.

same period, Whaley and Haskins also discussed a plan whereby IMC could insulate the barn door hardware business from IMC's creditors by forming a new company.  PARA ¶59.  Haskins believed that he would remain owner of the barn door hardware business.  Id. ¶60.

In August 2015 Whaley, while still employed by IMC, registered the domain name www.thebarndoorhardwarestore.com.  DSMF ¶11.  Defendants maintain that Whaley registered the domain for his own personal use, while IMC contends that Whaley registered the domain name as part of his employment with IMC in order to further IMC's business.  Id.

During this same time period, and at times thereafter, IMC advertised barn door hardware on the website www.spiralstairsofamerica.com in various ways.  In August 2015 IMC advertised the hardware as "Sliding Barn Door Hardware."  DSMF ¶12.   In September 2015, the webpage directed purchasers of barn door hardware products to an e-Bay store for "Barn Doors of America." DMSF ¶13.  From October 2015 through March 21, 2016, the webpage included a link to the website www.barndoorhardwarestore.com.  DSMF ¶14.  As of April 15, 2016, IMC's webpage included this same link and invited consumers to "check out our friends at:  The Barn Door Hardware Store."  DSMF ¶15.  From October 17, 2016 until September 16, 2017, IMC did not advertise barn door hardware at all on its webpage.  SMF ¶16.  Thereafter, from at least September 27, 2017 until at least January 3, 2019, IMC utilized two different webpage templates for www.spiralstairsofamerica.com, one which advertised barn door hardware products and another which did not.  Id. ¶17.

Meanwhile, in early January 2016, Whaley met with Haskins concerning the formation of BDHS. DSMF ¶¶18-20.  The parties disagree as to what occurred during this meeting.  Whaley asserts that he informed Haskins he was forming a separate business entity in order to market and sell barn door hardware on his own behalf.  Id. ¶19.  IMC claims that the discussions

3

revolved solely around IMC forming a new business division with the goal of insulating the barn door hardware business from IMC's judgment creditors and tax lien holders.  Id. ¶18.

Ultimately, Whaley formed BDHS as a limited liability company on January 29, 2016, naming himself as the owner and sole member.  DSMF ¶¶20-21.  Haskins was initially unaware that Whaley had listed himself as BDHS's sole member and believed himself to be the owner of the barn door hardware business.  PARA ¶60; DSMF ¶¶18-19.

Even after forming BDHS, Whaley continued to be employed by IMC until his departure sometime in late 2016 or early 2017.  DSMF ¶¶22-23; ECF No. 94-5, ¶3.  In the months following BDHS's formation, Whaley moved the business into rented space at a new location at Griswold Plaza in Erie.  PARA ¶61.  The company continued to use the name "THE BARNDOOR HARDWARE STORE" and also used a black and white logo depicted as:



PARA ¶¶55, 61.  BDHS also continued to maintain the website www.barndoorhardwarestore.com and utilized the same third-party websites, such as eBay, Amazon, Etsy, and Houzz.  Id. ¶61; Haskins Depo., ECF No. 94-3, at 77:6-8.  Although BDHS opened separate bank accounts from IMC, it continued to operate the same PayPal account utilized by IMC and deposited the majority of its sales receipts there.  PARA ¶62.

For the remainder of 2016, while Whaley remained in IMC's employ, BDHS and IMC had an ongoing business relationship, the exact nature of which is disputed by the parties.  The

parties agree that, throughout most or all of 2016, IMC manufactured and supplied barn door hardware for BDHS and BDHS utilized IMC's employees to perform certain services.  DSMF ¶¶25-27.  In return, Whaley made payments to IMC, and sometimes to Haskins directly, totaling more than $93,000. Id. ¶29.  However, no set prices were established -- and no invoices were generated -- for the parts and labor that IMC provided.  Id. ¶¶25-27.  During the time period January 2016 through January 2017, Whaley was actually the record owner of BDHS; however, Haskins believed that the payments from BDHS were business distributions to himself in his capacity as owner of the company.  DSMF ¶¶25-27.

In late 2016 or early 2017, Whaley left IMC's employment.  PARA ¶68.  By this time, BDHS had stopped using IMC's employees and stopped receiving products from IMC, but it continued to use the website www.barndoorhardwarestore.com, the aforementioned logo, the same social media pages, and most of the same third-party websites (excluding Etsy).  Id.  Whaley was able to make this transition because he possessed login information and access codes to these websites.  PARA ¶69.  Whaley subsequently changed the login information, preventing IMC from accessing the BDHS website and third-party retailer websites.  Id.

Whaley claims ownership of all proceeds from the sale of barn door hardware from the www.thebarndoorhardwarestore.com website, the Barndoor Hardware eBay page, and any other sales deposited into the PayPal account that took place following formation of the Barndoor Hardware Store.  PARA ¶67.  IMC states that its business has suffered, and it has realized modest sales since 2017.  Id. ¶70.

## Procedural History

Based on the foregoing events, IMC initiated this lawsuit on May 30, 2017.  IMC's complaint contains five counts, including a violation of the Lanham Act, 15 U.S.C. §1125(a) (Count I), a request for injunctive relief (Count III), and state law claims predicated on unfair competition (Count II), breach of fiduciary duty (Count IV), and conversion (Count V).

After a period of discovery, the parties filed cross-motions for partial summary judgment, which are now pending before the Court.  IMC requests entry of summary judgment relative to the conversion claim at Count V.  ECF No. 85.  Defendants request entry of summary judgment as to the federal Lanham Act claim at Count I.  ECF No. 88.  In addition, Defendants request that the Court decline to exercise supplemental jurisdiction over the state law claims or, in the alternative, enter judgment in Defendants' favor at Counts II through IV.

These motions are now adequately briefed and ripe for adjudication.  The Court will address Defendants' motion first, as it is ultimately dispositive of this case.

## Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In analyzing a motion under Rule 56, the Court must construe the evidence and all reasonable inferences arising therefrom in the light most favorable to the non-movant. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## Discussion

6

A.  *IMC's Federal Claim*

In Count I of the Complaint, IMC asserts a claim for alleged violation of 43(a) of the

Lanham Act, which prohibits the use of "any word, term, name, symbol, or device, or any

combination thereof, or any false designation of origin" that is "likely to cause confusion, or to

cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods." 15

U.S.C. §1125(a).  ECF No. 1 at 11.  Having previously disclaimed any cause of action predicated

upon Defendants' use of a particular trademark, see ECF No. 91-11 at 10, IMC now clarifies that

it is actually asserting a Lanham Act claim based upon *trade dress* infringement.

Section 43(a) of the Lanham Act includes protection for a party's "trade dress," which

"has been defined as the total image or overall appearance of a product, and includes, but is not

limited to, such features as size, shape, color or color combinations, texture, graphics, or even a

particular sales technique."  *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 (3d Cir.

2014) (quoting *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 171 (3d Cir. 2000)).  "[T]rade

dress protection extends only to incidental, arbitrary or ornamental product features which

identify the product's source."  *Id.* at 309 (quoting *Shire U.S. Inc. v. Barr Labs., Inc.*, 329 F.3d

348, 353 (3d Cir. 2003)).  Examples of trade dress include:  the outer shape and design of a

Ferrari car, *see Ferrari S.P.A. v. Roberts*, 944 F.2d 1235 (6th Cir.1991); the arrangement,

content, and layout of an Abercrombie & Fitch catalogue, *see Abercrombie & Fitch Stores, Inc.

v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619 (6th Cir.2002); the graphics and arrangement of

elements on a box of Excedrin, *see Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.*, 973 F.2d

1033, 1037 (2d Cir.1992); and the decoration, vibe, and "motif" of a Mexican restaurant, *see

Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992).  "In short, trade dress is the overall

look of a product or business."  *Fair Winds,* 764 F.3d at 309.

"Trade dress is generally classified into the categories of either 'product design' (also known as 'product configuration') or 'product packaging,' and occasionally a 'tertium quid,' a third, indeterminate catchall." *Groeneveld Transp. Efficiency, Inc. v. Lubecore Int'l, Inc.*, 730 F.3d 494, 503 (6th Cir. 2013) (citing *Walmart v. Samara Bros.*, 529 U.S. 205, 215 (2000)). Some courts have extended the concept of trade dress to include websites that portray a certain "look and feel." *See, e.g., Conference Archives, Inc. v. Sound Images, Inc.*, Civil No. 3:2006–76, 2010 WL 1626072, at *16 (W.D. Pa. Mar. 31, 2010) (holding that the "look and feel" of a web site can constitute a trade dress, protected by the Lanham Act.); *Blue Nile, Inc. v. lce.com, Inc.*, 478 F. Supp. 2d 1240 (W.D. Wash. 2007) (declining to summarily dismiss plaintiff's allegation of infringement of trade dress in the "look and feel" of the appearance of a website); *accord Bambi Baby.com Corp. v. Madonna Ventures, Inc.,* No. CV 18-12669-WHW-CLW, 2019 WL 2337447, at *7 (D.N.J. June 3, 2019) (holding that plaintiff stated a claim under Lanham Act Section 43(a) for trade dress infringement as to its website's 'distinctive palette of colors and image/video filters featuring a clean, modern, and straightforward user interface highlighted by bright, vibrant colors set in an environment/ backdrop of warm, baby tones[.]'"); Xuan–Thao N. Nguyen, *Should It Be a Free for All? The Challenge of Extending Trade Dress Protection to the Look and Feel of Web Sites in the Evolving Internet*, 49 Am. U. L. Rev. 1233, 1236, 1240 (2000) (arguing that a combination of a website's "color, graphics, animations, designs, layout, [and] text" may qualify for trade dress protection).

To establish a claim under the Lanham Act based upon unregistered trade dress infringement, a claimant must prove that:  (1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) the alleged infringer's use of the allegedly infringing design is likely to create confusion regarding the origin

8

of the goods or services. *Fair Wind Sailing*, 764 F.3d at 309 (citing *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007)). In addition to these factors, the party claiming trade dress protection must articulate the specific elements of its alleged trade dress. *Id.* Where a plaintiff seeks trade dress protection for an entire line of products, the plaintiff must first show that the series or line has a recognizable and consistent overall look. *Rose Art Indus., Inc. v. Swanson*, 235 F.3d 165, 173 (3d Cir. 2000).

"Before it reaches the question of protectability, however, a district court should scrutinize a plaintiff's description of its trade dress to ensure itself that the plaintiff seeks protection of visual elements of its business." *Fair Winds Sailing*, 764 F.3d at 309. This is necessary because "trade dress" is limited to things that "create *some* visual impression on consumers. Otherwise, there is no 'dress' to protect." *Id.* (emphasis in the original).

In *Fair Winds*, for example, the plaintiff – a corporation that owned various sailing schools -- defined its trade dress as "the combination of its choice to solely employ catamaran vessels" and its "unique teaching curriculum, student testimonials, and registered domain name," which "all combine to identify Fair Wind's uniquely configured business to the general public." 764 F.3d at 309. The U.S. Court of Appeals for the Third Circuit rejected this definition and concluded that the plaintiff's "trade dress," by its own terms, was "simply a hodgepodge of unconnected pieces of its business, which together do not comprise any sort of composite visual effect." *Id.* at 310. Rather than arguing that the defendant had stolen its "look" in order to lure away customers, the plaintiff claimed that the defendant had "cop[ied] every material element of [its] business" and presented those elements to the public. *Id.* The court found that this type of claim "[had] little to do with trade dress." *Id.*

Judged against the foregoing standards, the Court finds that IMC's claim for trade dress infringement is untenable as a matter of law.  As a preliminary procedural matter, the Court notes that IMC failed to identify in its complaint any elements of the alleged "trade dress" that was allegedly infringed.  *See Fair Winds,* 764 F.3d at 310 (dismissing trade dress infringement claim under Rule 12(b)(6) where complaint failed to identify elements of protectable trade dress).  In fact, IMC's complaint did not even reference the phrase "trade dress" at all; instead it appears that IMC first articulated its trade dress theory in its brief in opposition to Defendants' motion for partial summary judgment.  Accordingly, Defendants now argue, somewhat persuasively, that IMC's trade dress claim should be precluded as an improper attempt to retroactively amend its pleading.  *See Warfield v. SEPTA*, 460 F. App'x 127, 132 (3d Cir. 2012) ("A plaintiff may not amend a complaint by raising arguments for the first time in a brief in opposition to a motion for summary judgment.")

Even accepting Plaintiff's trade dress infringement claim at face value, however, the claim fails on the merits.  As noted, trade dress pertains to the visual elements of a business or product.  *Fair Winds Sailing*, 764 F.3d at 309.  In its Rule 56 brief, IMC describes its alleged trade dress as its "business name and channels of commerce."  ECF No. 95 at 1.  Elsewhere in its brief, IMC describes its alleged trade dress as*:* (1) the name "BARNDOOR HARDWARE STORE"; (2) the black and white logo showing hardware; (3) the website "www.thebarndoorhardwarestore.com"; (4) Defendants' use of social media pages depicting IMC's employees; and (5) Defendants' use of emails with the domain "spiralstairsofamerica.com."  Id. at 7.  Several of the foregoing elements – such as the business's trade name, the web address "www.thebarndoorhardwarestore.com," the email domain name "spiralstairsofamerica.com," and IMC's unspecified "channels of commerce" – are not things

10

that create a "visual impression" on consumers or "dress" the product.  Therefore, they are not

per se protectable as "trade dress."  *See Fair Winds supra*, at 309-10; *see also Greenberg v.*

*Johnston,* CV-14-04605, 2014 WL 12586252, at *3 (C.D. Ca. Oct. 22, 2014) (items such as

domains and websites, a web hosting service account, a telephone line account, a number of

online marketing accounts did not describe trade dress for purposes of alleging trade dress

infringement).

In theory, distinctive ornamental features on a website, or on social media pages, or on

third-party vendor sites, might constitute protectable trade dress.  But to the extent that such

content forms the basis of IMC's "trade dress" claim, the Court finds that IMC has failed to

articulate or produce evidence of the specific design aspects it is seeking to protect.

In *Fair Winds,* the Court of Appeals ruled that the plaintiff's trade dress infringement

claim could not survive the Rule 12(b)(6) stage because the complaint "failed to allege any facts

at all relating to the substance of its own website."  764 F.3d at 310.  As discussed, the plaintiff

(Fair Winds Sailing, Inc.) merely alleged that the defendant had copied aspects of its business

(including a picture of plaintiff's catamaran, student feedback mechanisms, curriculum, and

nearly identical itineraries) and placed them on the defendant's website.  As the Court of Appeals

explained, this "[said] nothing about the content of Fair Wind's website, let alone whether Fair

Wind's website has a composite look that might constitute a trade dress."  Id.  As a result, the

plaintiff had failed to give the defendant "fair notice" of the "overall look it wish[ed] to protect."

*Id.*

Here, as in *Fair Winds,* Plaintiff has failed to enumerate "what specific elements of its

website comprise a distinctive trade dress or that its site has any distinctive ornamental features"

meriting protection.  *See* 764 F.3d at 310.  IMC has produced evidence that, on June 3, 2016,

BDHS's website advertised its recognition as a "Google Trusted Store."  According to IMC, BDHS's website included language that suggested this "Google Trusted Store" accreditation had taken many months to achieve and was predicated upon a record of customer satisfaction that actually predated BDHS's existence.  ECF No. 95 at 4; see PARA ¶66.  But this evidence says nothing about the overall "look and feel" of IMC's own website or the specific design aspects thereof that IMC wishes to protect.

As for social media, IMC has submitted evidence that BDHS utilized photos of IMC's facility and workers on its social media pages, with phrases like "American-Made," "Our guys hard at work!" and "Busy getting down to work here at The Barn Door Hardware Store!" ECF No. 95 at 3-4; see PARA ¶63.  BDHS similarly advertised on certain third-party vendor sites that it had "been making/selling library ladder hardware for 12 years, spiral stairs for 40 years and we have finally released our version of FLAT TRACK SLIDING BARN DOOR HARDWARE." ECF No. 95 at 3-4; PARA ¶¶64-65.  IMC asserts that *it* (i.e., IMC) and its predecessor business have been making spiral stairs for 40 years, but BDHS has not.  ECF No. 95 at 4.  But even accepting these facts as true, they do not give rise to a triable issue of trade dress infringement. Like the defendants in *Fair Winds,* Whaley and BDHS may have implicitly or explicitly appropriated aspects of IMC's business for use on the BDHS website and social media pages; however, such evidence is insufficient to establish that IMC's own website, social media pages, third-party vendor sites, or other "channels of commerce" have a specific "composite look" that is subject to protection under the Lanham Act.  Plaintiff's failure to adduce evidence in this regard renders trade dress infringement claim deficient as a matter of law.

In addition, as discussed above, only those aspects of trade dress that are ornamental – as opposed to "functional" – are protected by the Lanham Act.  *See Fair Wind Sailing*, 764 F.3d at

309.  The Supreme Court has defined "functional" trade dress as that which (1) "is essential to the use or purpose of the article"; (2) "affects the cost or quality of the article"; or (3) would, if denied to others, "put competitors at a significant non-reputation-related disadvantage." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 33 (2001).  Aspects of a website that are functional, as opposed to ornamental, are not protectable "trade dress." *See Fair Winds,* 764 F.3d at 310-311 (features on plaintiff's website -- such as student feedback procedures, images of catamarans, teaching itineraries, and curriculum – were "functional" and, therefore not protectable "trade dress," because "they all affect[ed] the quality of [plaintiff's] business" and "play[ed] a critical role in the consumer demand for [plaintiff's] services, rather than merely identifying [plaintiff] as the source of the sailing instruction); *Bambi Baby.com Corp. v. Madonna Ventures, Inc.*, No. CV 18-12669-WHW-CLW, 2019 WL 2337447, at *4-5 (D.N.J. June 3, 2019) (finding that website features -- such as the placement of a company logo on each page of the website, a search bar, a pop-up chat window, and indices that include the company's "about us" section, links to product-specific sections within the website, and a buttons for the company's social media pages – were all "functional," and therefore not protectable trade dress). Nowhere in its summary judgment filings has IMC attempted to delineate those portions of the subject website or third party vendor sites that are non-functional, and thus potentially protectable trade dress.

In addition, IMC has failed to adduce evidence establishing that its alleged trade dress is distinctive.  Trade dress can be "distinctive" in one of two ways: (1) it can either be "inherently distinctive" or (2) if not inherently distinctive, it must have developed "secondary meaning, which occurs when, in the minds of the public, the primary significance of a [design] is to identify the source of the product rather than the product itself." *Wal–Mart Stores, Inc. v.*

*Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000) (internal quotations omitted).  Here, IMC has

not argued that its alleged trade dress has developed secondary meaning; instead, it argues that

its trade dress is inherently distinctive.

Federal courts have utilized differing standards for determining whether product

packaging is inherently distinctive.  Some district courts within this circuit have utilized the

spectrum of categories that the U.S. Court of Appeals for the Second Circuit first articulated in

the context of trademarks, in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d

Cir.1976).  *See, e.g., Am. Beverage Corp. v. Diageo N. Am., Inc.,* 936 F. Supp. 2d 555, 598

(W.D. Pa. 2013); *McNeil Nutritionals, LLC v. Heartland Sweeteners LLC*, 566 F. Supp. 2d 378,

388 (E.D. Pa. 2008).  Under the *Abercrombie* paradigm, trademarks are deemed to fall into one

of five categories along a spectrum of increasing distinctiveness:  "(1) generic, (2) descriptive,

(3) suggestive, and (4) arbitrary or fanciful."  *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S.

763, 768 (1992).  As applied to the context of trade dress claims,

> [a] product packaging trade dress that is suggestive, arbitrary, or fanciful is
> inherently distinctive. See [*Two Pesos*, 505 U.S. at 768] ("The latter three
> categories of marks, because their intrinsic nature serves to identify a particular
> source of a product, are deemed inherently distinctive and are entitled to
> protection."). An arbitrary or fanciful trade dress neither describes nor suggests
> anything about the product, while a suggestive trade dress requires consumer
> "imagination, thought, or perception" to demonstrate what the product is. *A & H
> Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221–22 (3d
> Cir.2000) (quoting *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d
> Cir.1986)). A trade dress is descriptive if it "forthwith convey[s] an immediate idea
> of the ingredients, qualities or characteristics of the goods." *Id.* (quotation omitted).

*McNeil Nutritionals, LLC,* 566 F. Supp. 2d at 388.

Other courts have utilized the test established in *Seabrook Foods, Inc. v. Bar–Well

Foods, Ltd.*, 568 F.2d 1342, 1344 (C.C.P.A.1977).  This test asks:  (1) whether the design or

shape at issue is a common, basic shape or design; (2) whether it was not unique or unusual in a

particular field; (3) whether it was a mere refinement of a commonly-adopted and well-known

form of ornamentation for a particular class of goods which consumers would view as mere

ornamentation.   *Id*. at 1344.  If any of these questions is answered in the affirmative, then the

trade dress design is not inherently distinctive and there must be sufficient evidence of the design

having acquired a secondary meaning.  *See id.; In re Chippendales USA, Inc*., 622 F.3d 1346,

1355, 96 U.S.P.Q.2d 1681 (Fed. Cir. 2010) ("A finding that any one of these factors is satisfied

may render the mark not inherently distinctive.") [2]

In its brief, IMC appears to assume that the *Abercombrie* standard applies.  To that end,

IMC states that the trade name "BARNDOOR HARDWARE STORE," the accompanying black

and white logo of a hardware set, and the web domain name

www.thebarndoorhardwarestore.com may be "descriptive" elements, since they describe the

product being sold.  Nevertheless, IMC states that courts must consider the overall impression of

the combined elements of a claimant's trade dress to determine whether the unique elements

serve to identify a particular source.  ECF No. 95 at 8 (citing *Am. Bev. Corp*., 936 F. Supp. 2d at

600).  According to IMC, when the website domain, trade name and business logo are viewed in

---

[2]  According to one leading treatise, the *Seabrook* test is "by far the preferable test to classify inherently distinctive trade dress in packaging and containers," as the *Abercrombie* spectrum "was specifically developed for word marks and does not translate into the world of shapes and designs."  *See* 1 McCarthy on Trademarks and Unfair Competition § 8:13 (5th ed.).  The *Seabrook* test is also the one adopted by most circuit courts of appeal.  *See, id*. (citing cases).  Nevertheless, the U.S. Court of Appeals for the Third Circuit has not yet explicitly weighed in on whether it would adopt the *Seabrook* standard over the *Abercrombie* standard in determining the distinctiveness of a claimant's unregistered trade dress.  In *Duraco Prod., Inc. v. Joy Plastic Enterprises, Ltd*., 40 F.3d 1431, 1440 (3d Cir. 1994), the Court of Appeals rejected the application of the *Abercrombie* test to determine inherent distinctiveness in actions for infringement of trade dress based on product configuration/product design.  In doing so, however, the Court specifically distinguished product configuration/product design trade dress from product packaging trade dress. *See id*., 40 F.3d at 1440–41.  To the extent IMC has alleged any elements that could legitimately constitute "trade dress," the Court views those elements as more in the nature of packaging trade dress, which makes the *Abercrombie* test arguably relevant.

this "conjunctive" fashion, they "create an overall impression that there is only one company selling hardware products under the name 'THE BARNDOOR HARDWARE STORE' through a website using that same name and logo." *Id*. "Together," IMC argues, "the elements identify an inherently distinctive source of the barn door products sold online." *Id*. at 8-9.

In a sense, IMC is right:  there is, in fact, only one company selling hardware products under the aforementioned name, through the aforementioned website, using the aforementioned logo.  But that company is BDHS, not IMC.  Beyond this line of argument, IMC offers nothing in the way of evidence to suggest that the alleged trade dress elements are so inherently distinctive that they would cause consumers to identify *IMC* as the source of the hardware products being sold.

At the summary judgment stage, IMC cannot rest its case on conclusory allegations; it must, instead, adduce evidence in support of each essential element of its claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Such evidence must be sufficient to support a jury's factual determination in favor of IMC. *Anderson v. Liberty Lobby, Inc*. 477 U.S. 242, 249 (1986).  Evidence that merely raises some metaphysical doubt about the existence of a material fact is insufficient to satisfy IMC's burden. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586, 538 (1986).  In this Court's view, IMC has failed to demonstrate the existence of a genuinely disputed material fact relative to its claim of trade dress infringement.  Therefore, the Court will grant Defendants' motion for partial summary judgment as to Count I of the complaint.

B.  *IMC's State Law Claims*

The Court having determined that IMC cannot proceed on its federal claim, the only remaining causes of action are Plaintiff's state law claims in Counts II through V, and

Defendant's counterclaim under Pennsylvania law for libel.  The Court's sole basis for exercising subject matter jurisdiction over these claims is Congress's grant of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  Absent extraordinary circumstances, a federal court may decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3*); see Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129, 135 (3d Cir.), *cert. denied*, 140 S. Ct. 563, 205 L. Ed. 2d 358 (2019). Because no extraordinary circumstances are present in this case that would counsel in favor of this Court exercising supplemental jurisdiction, the Court will dismiss the remaining state law claims without prejudice to the parties' right to pursue those claims in state court.  Accordingly, the Court need not, and does not, address the merits of Plaintiff's cross-motion for partial summary judgment relative to Count V.

## **Conclusion**

Based upon the foregoing reasons, the Court will grant Defendants' motion for partial summary judgment relative to Count I of the complaint.  The Court will dismiss Plaintiff's remaining state law claims, and Defendants' counterclaim, without prejudice.  The Court will also dismiss, without prejudice, Plaintiff's cross-motion for partial summary judgment as to Count V of the Complaint.

An appropriate Order follows.

Susan Paradise Baxter
United States District Judge